**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **TWC CONCRETE, LLC** ) | |
| 10737 Medallion Drive ) | **Case No.:** |
| Cincinnati, Ohio 45241 ) | |
| ) | |
| **Plaintiff,** ) | **Judge _____** |
| ) | |
| **v.** ) | |
| ) | |
| **ANTHONY DECARLO, JR.** ) | <u>**Verified Complaint with Applications**</u> |
| 9177 Camargo Road ) | <u>**for Temporary Restraining Order,**</u> |
| Cincinnati, Ohio 45243, and ) | <u>**Preliminary Injunction, Permanent**</u> |
| ) | <u>**Injunction, and Other Injunctive**</u> |
| **DOMINION CONCRETE SERVICES, LLC,** ) | <u>**and/or Equitable Relief**</u> |
| **F/K/A/ DECARLO CONCRETE AND** ) | |
| **CONSULTING** ) | |
| C/O Registered Agent ) | |
| GH&R Business Services, Inc. ) | |
| 312 Walnut Street, Suite 1800 ) | |
| Cincinnati, Ohio 45202 ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

Plaintiff TWC Concrete LLC, a subsidiary of Baker Construction Enterprises, Inc.,

("TWC-Baker" or "Plaintiff"), by and through Counsel, for its Verified Complaint with

Applications for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, and

Other Injunctive and/or Equitable Relief against Defendants Anthony DeCarlo, Jr. ("DeCarlo")

and Dominion Concrete Services, LLC ("Dominion"), hereby alleges and states as follows:

<u>**Parties**</u>

1.     Plaintiff is an Ohio limited liability company that specializes in providing

construction, concrete services, general contracting, and construction management to industries

1

throughout the United States. Plaintiff is a wholly-owned subsidiary of Baker Construction Enterprises, Inc. ("Baker"), an Ohio corporation.

2.      Upon information and belief, Defendant DeCarlo is a United States citizen and resident of Ohio. Plaintiff employed DeCarlo from on or about January 1, 2020 to June 6, 2023.

3.      Upon information and belief, Dominion is an Ohio limited liability company whose sole member is DeCarlo.

## Jurisdiction and Venue

4.      This court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it involves a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* The court has supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367.

5.      This court has personal jurisdiction over DeCarlo because he is domiciled in Ohio. DeCarlo also submitted to the Court's jurisdiction, contracted with TWC-Baker in Ohio, conducts business in Ohio, and/or committed intentional and tortious acts against an Ohio company.

6.      This court likewise has personal jurisdiction over Dominion because it is domiciled in Ohio, conducts business in Ohio, and/or committed intentional and tortious acts against an Ohio company.

7.      Proper venue for this action lies in this court under 28 U.S.C. § 1391 because DeCarlo resides in this district, Dominion is based in this district, and a substantial amount of the events giving rise to this claim occurred in this district. Further, DeCarlo contractually agreed to jurisdiction and venue in this district.

## Preliminary Statement

8.      TWC-Baker brings this case against DeCarlo and Dominion based upon extraordinary facts just recently discovered. TWC-Baker seeks to enjoin Defendants from

capitalizing on their blatant and deceptive misconduct which constitutes a breach by DeCarlo, in concert with Dominion, of his contractual and fiduciary obligations to TWC-Baker. This is not by any stretch of the imagination a case of hardship for DeCarlo. To the contrary, in exchange for payments of millions of dollars, DeCarlo and his family agreed to sell their family business to TWC-Baker. The sale also included a lucrative employment agreement for DeCarlo with TWC-Baker which set forth unequivocal obligations to not compete with TWC-Baker, solicit its employees, or misappropriate its confidential information.

9. Instead, recently revealed facts show that DeCarlo began planning a scheme almost a year ago when, unbeknownst to TWC-Baker, DeCarlo (i) established a separate company, DeCarlo Concrete and Consulting, LLC, wholly owned by DeCarlo, to compete directly against TWC-Baker; (ii) made plans to cause Old Dominion Freight Line, Inc. ("ODFL") to terminate its multi-million dollar contracts with TWC-Baker; (iii) changed the name of his company to "Dominion Concrete Services, LLC" in order to conceal DeCarlo's activities, including new contracts between Dominion and ODFL under which DeCarlo assumed performance of the very same contracts that previously existed between TWC-Baker and ODFL; (iv) misappropriated several TWC-Baker trade secrets, including nearly fifty unknown files from TWC-Baker's protected "OneDrive" storage system which contains some of the company's most sensitive information on all projects, human resources, financials, and more; and (v) most egregiously, took all of these steps while he remained an employee of TWC-Baker and continued to receive a paycheck from TWC-Baker. The trail of misrepresentations and deception now discovered, which will become even more clear with discovery, has caused, and will continue to cause, irreparable harm to TWC-Baker. Separately, ODFL, to the extent it was not already aware, has been placed

on notice of DeCarlo's contractual obligations and potential risk of tortious interference with TWC-Baker's employment agreement with DeCarlo.

## General Allegations

### TWC Baker's Creation and Business

10.     Baker has operated in the concrete and construction industry since the 1960s, when founder Dan Baker and his two brothers formed Baker Cement Contractors, Inc., in Oxford, Ohio.

11.     The business quickly grew, moving from mostly residential projects in the 1960s, to receiving its first commercial project in 1972, to receiving a one million square foot project in 1978.  By 1980, Baker Cement Contractors, Inc., opened a regional office in Houston, Texas, and changed its name to Baker Concrete Construction, Inc.  Baker Construction Enterprises, Inc. was formed as Baker Concrete Construction's holding company.

12.     Baker is now the nation's leading commercial concrete construction contractor, having performed over 14,000 projects in virtually every market segment.  Baker oversees a large portfolio of subsidiary companies.

13.     In or around 2010, Dan Baker was approached by his friend, Tony DeCarlo ("Tony"), Defendant DeCarlo's father, seeking financial assistance.  As a result, Baker purchased a 51% interest in Tony's business TWC Concrete Services, LLC ("TWC Services").  A few years later, Baker decreased its interest in TWC Services to 30%.  Tony, DeCarlo, and other investors then owned the controlling interest.

14.     In 2019, Tony and his son, Defendant Anthony DeCarlo Jr., chose to sell TWC Services to Baker, who would reform the business into a Baker subsidiary.

15.     Accordingly, in late 2019, Baker formed TWC Concrete LLC (referred to herein as "TWC-Baker" to avoid confusion), to purchase the assets of TWC Services.

16.     On January 1, 2020, TWC-Baker as Buyer and TWC Services as seller entered into an Asset Purchase Agreement, whereby TWC-Baker purchased all assets of TWC Services.

17.     As consideration for TWC Services's assets, Baker (through TWC-Baker) agreed to pay the cash amount of $6.8 million, an "Earnout Payment, if any," plus a 15% equity interest in TWC-Baker.

18.     As set forth in TWC-Baker's Amended and Restated Operating Agreement dated January 1, 2020, immediately upon the closing of the Asset Purchase Agreement, TWC Services "distributed all of its rights, title and interest in the Company's Units to Anthony DeCarlo, Jr.," making the two members of TWC-Baker on January 1, 2020: Baker (85%); and DeCarlo (15%).

19.     Upon execution of the sale, TWC Services ceased operations, continuing instead under TWC-Baker.

20.     Since then, TWC-Baker has expended substantial resources developing its business and growing the company.

21.     Due to the extremely competitive nature of the concrete and construction industry, TWC-Baker spends significant time, money, and resources developing its goodwill and its relationships with new customers and strengthening its relationships with existing customers and subcontractors, as well as with suppliers and others within the industry.

22.     TWC-Baker offers its employees relationships, tools, systems, and training to assist them in gaining intimate knowledge of TWC-Baker's business, its customers, suppliers, construction strategy, service, and other confidential and proprietary information.

23.     TWC-Baker has made substantial investments to develop, protect, and maintain confidential and proprietary information, including but not limited to its operating policies and procedures; financial records; customer, supplier, and subcontractor lists, including individual

names and contact information for key personnel; trade secrets; pricing, marketing, and sales strategies; construction, concrete, and on-site performance strategies; and other data, processes, and procedures.

24.     TWC-Baker takes multiple measures to protect the confidentiality of its trade secrets and other proprietary information, including requiring certain employees to execute agreements that restrict their ability to compete against TWC-Baker, to solicit TWC-Baker's employees, and to use or disclose TWC-Baker's confidential information. TWC-Baker's Employee Handbook also prohibits all employees from sharing confidential information outside the company, and employees must password-protect their computers through multi-level authentication.

### DeCarlo's Employment Agreement

25.     On January 1, 2020, the same day that Baker executed the Asset Sales Agreement with TWC Services, TWC-Baker and DeCarlo entered into an Employment Agreement, attached as Exhibit A.

26.     Per the Employment Agreement, DeCarlo agreed to serve TWC-Baker as its Vice President of Operations.  He also agreed that he would perform the duties incident to the position of Vice President of Operations, and that he would perform any other such duties "as the Company's managing member [Baker Construction Enterprises, Inc.], President, Chief Executive Officer, Chief Financial Officer or any person designated by any of the foregoing to have management authority over" DeCarlo.  Employment Agreement § 1(a).

27.     As the 85% owner, Baker was the managing member of TWC-Baker at that time. Baker now owns 100%, and remains the managing member.

28.     TWC-Baker paid DeCarlo a lucrative annual base salary for his work as a Vice President, along with a substantial yearly cash bonus targeted at 60% of his base salary. Employment Agreement § 2(a)–(b).

29.     DeCarlo's Employment Agreement contained several provisions to protect TWC-Baker's confidential and proprietary information.

30.     First, DeCarlo's Employment Agreement contained a confidentiality section, which included a Nonuse and Nondisclosure provision.  That provision stated:

> (a) Nonuse and Nondisclosure.     While Employee is employed with the Company and at all times thereafter, Employee shall not (a) use any Confidential Information for any purpose, (b) disclose any Confidential Information to any person or entity, (c) keep or make copies of any documents, records or property of any nature containing or reflecting any Confidential Information or (d) assist any third party in engaging in any of the foregoing, except to the extent reasonably necessary or appropriate in connection with the performance of Employee's duties and responsibilities as an employee of the Company or as expressly authorized by the Manager.  Notwithstanding the foregoing, Employee may disclose Confidential Information at such times, in such manner and to the extent such disclosure is required by applicable law, provided that Employee (i) provides the Company with prior written notice of such disclosure so as to permit the Company to seek a protective order or other appropriate remedy, (ii) limits such disclosure to what is strictly required and (iii) attempts to preserve the confidentiality of any such Confidential Information so disclosed.

Employment Agreement § 5(a).

31.     "Confidential Information" is defined in the Employment Agreement as:

> all ideas, information, knowledge and discoveries, whether or not patentable, trademarkable or copyrightable, that are not generally known in the trade or industry and about which Employee has knowledge as a result of his employment or other relationship with the Company or any of its affiliates. However, 'Confidential Information' shall not include any information that now or hereafter is in the public domain by means other than disclosure by Employee in violation of this Agreement (or any other agreement containing confidentiality obligations on the part of Employee)."

Employment Agreement Exh. A(b).

32.     DeCarlo also agreed to a Noncompetition Provision that precluded DeCarlo from

competing with TWC-Baker while he was employed with TWC-Baker and for one year thereafter.

That provision stated:

> Section 6.     Noncompetition.     Employee acknowledges that, during
> Employee's employment with the Company, Employee will obtain knowledge of
> Confidential Information and may form relationships with customers, which
> knowledge and relationships would, in the event Employee becomes employed by
> or associated with a Conflicting Organization, provide invaluable benefits to such
> Conflicting Organization and cause irreparable harm to the Company and its
> affiliates.  To protect these and other legitimate business interests of the Company
> and its affiliates, Employee agrees that, during the Restricted Period, Employee
> shall not directly or indirectly:
>
>> (a) perform, on behalf of any Conflicting Organization within the Territory,
>> any services that are substantially similar to those that Employee performed
>> for the Company or any of its affiliates;
>>
>> (b) undertake, on behalf of any Conflicting Organization within the
>> Territory, any action related to the performance of services for the benefit
>> of any current or prospective customers of the Company as to whom
>> Employee (i) made sales or Substantial Sales Efforts, (ii) provided customer
>> support or (iii) had received Confidential Information about, within the two-
>> year period prior to the last day of his employment with Company, in each
>> case, to the extent those services compete with services performed by the
>> Company or services within the Company's active research, development,
>> expansion or business plans at the time of Employee's employment
>> termination;
>>
>> (c) engage in any other act or provide any other service in any circumstance
>> in which Employee's knowledge of Confidential Information may
>> reasonably be expected to directly benefit any Conflicting Organization
>> within the Territory; or engage in any practice the purpose of which is to
>> evade the other provisions of this Section 6;
>
> provided, however, that the foregoing shall not prohibit the ownership of less than
> 3% of the securities of any entity listed on a national securities exchange or traded
> in the national over-the-counter market.  Recognizing the specialized nature of the
> Company, Employee agrees that the duration, geographic scope and activity
> restrictions of this Section 6 are reasonable.

Employment Agreement § 6(a)–(c).

33.     "Conflicting Organization" is defined in the Employment Agreement as:

any person (including Employee as a sole proprietor) or entity engaged in, or planning or attempting to become engaged in, construction, concrete services (including, but not limited to, concrete pumping, placing, paving and screeding services), general contracting or construction management services that competes in any respect with services performed by the Company or were within the Company's actual or demonstrably anticipated research, development, expansion or business plans at the time of Employee's employment termination."

Employment Agreement Exh. A(c).

34.     "Restricted Period" is defined as:

while Employee is employed with the Company and for twelve (12) months immediately following termination of Employee's employment for any reason, except that if a court of competent jurisdiction finds that a twelve (12) month period is not reasonably necessary to protect legitimate business interests of the Company, then for nine (9) months immediately following termination of Employee's employment for any reason.

Employment Agreement Exh. A(d).

35.     "Territory" is defined as:

(i) the States of Ohio, Kentucky and Indiana (or, in the event a court of competent jurisdiction finds that the States of Ohio, Kentucky and Indiana is overbroad and unenforceable, then within 100 miles of the Company's headquarters, except if a court of competent jurisdiction finds that 100 miles is overbroad and unenforceable, then within 50 miles of the Company's headquarters) and (ii) any state, county, or city outside the State of Ohio in which (A) the Company has direct operations, operates through a joint venture in which it has more than a nominal investment interest or has engaged in substantial (and not isolated) marketing of its services or (B) the Company, with Employee's involvement or under Employee's direction, has planned to operate a facility or to engage in substantial (and not isolated) efforts to market its services, in each of the cases described in subclauses (A) and (B) above, within the two-year period immediately preceding the last day of Employee's employment with the Company.

Employment Agreement Exh. A(f).

36.     DeCarlo also agreed to a Nonsolicitation provision that precluded DeCarlo from soliciting any current or former TWC Baker employees to leave TWC-Baker to work for competing entities. That provision stated:

Section 7. <u>Nonsolicitation</u>.   During the Restricted Period, Employee shall not, directly or indirectly, solicit, induce or otherwise offer employment or engagement as an independent contractor to, or engage in discussions regarding employment or engagement as an independent contractor with, any person who is or was an employee, consultant or commissioned salesperson of, or who performs or performed similar services for, the Company or any of its affiliates, or assist any third party with respect to any of the foregoing, unless such person has been separated from his or her employment or other relationship with the Company and each of its affiliates for a period of 12 consecutive months.

Employment Agreement § 7.

37.     The Employment Agreement provided that breaches of any of the foregoing provisions would constitute "cause" for termination of the Employment Agreement.   Employment Agreement Exh. A(a).   It further provided that "cause" would also exist if DeCarlo breached his "duty of care, duty of loyalty or duty not to misappropriate any business opportunity of the Company." *Id*.

38.     The Employment Agreement also provided that DeCarlo agreed that the restrictive covenants set forth above are essential to protecting TWC-Baker's trade secrets and other proprietary information, and that breaches of the restrictive covenants would cause irreparable harm.   DeCarlo agreed that the non-prevailing party in an action to enforce the restrictive covenants will be responsible for attorney fees.   That provision states:

Section 10.     Miscellaneous. . . . (c) <u>Remedies for Breach</u>. Employee     stipulates that the covenants contained herein are essential for the protection of the trade secrets, confidential business and technological information, relationships, and competitive position of the Company; that a breach of any covenant contained herein would cause the Company irreparable damage for which damages at law would not be an adequate remedy; and that, in addition to damages and other remedies to which the Company would otherwise be entitled, it will be entitled to whatever injunctive relief is appropriate for any such breach. In any action brought to enforce any of the covenants in Section 5, Section 6 or Section 7, the non-prevailing party in such action, as determined by a court of competent jurisdiction, will be responsible for attorney fees and other legal expenses incurred by the prevailing party or its successors or assigns. In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if Employee commits a material breach of any of the

provisions of Section 5, Section 6 or Section 7, the Company shall have the right and remedy to have such provisions specifically enforced by any court having equity jurisdiction. The term(s) of any covenant(s) in Section 5, Section 6 or Section 7 will not run during any time in which Employee is in violation of said covenant(s).

Employment Agreement § 10(c).

### **DeCarlo's Performance at TWC Baker**

39.     During DeCarlo's tenure with TWC-Baker, the company has underperformed.

40.     DeCarlo struggled to transition from being Chief Executive Officer of TWC Services—a small family business—to being Vice President of Operations of TWC-Baker, a subsidiary within a much larger company. He was often unresponsive to upper-level Baker management and was reluctant to learn and adopt Baker operating procedures.

41.     Baker and TWC-Baker invested significant resources into developing DeCarlo's leadership skills and integrating him into the larger Baker enterprise. Baker enrolled DeCarlo in an eight-month leadership development program and engaged external consultants to coach DeCarlo on leadership and management skills.

42.     DeCarlo was unresponsive to these trainings and struggled to integrate himself into the Baker family of companies. He attempted to work independently, neglecting his obligations to Baker.

43.     On June 1, 2022, Baker purchased DeCarlo's 15% interest in TWC-Baker for over one million dollars. DeCarlo did not object to selling his shares. At that time, DeCarlo remained the Vice President of Operations at TWC-Baker, but he no longer retained any ownership interest. DeCarlo continued his employment with TWC-Baker after selling his ownership interest.

44.     One of TWC-Baker's primary customers is ODFL, a national transport company. TWC-Baker contracted with ODFL to construct and maintain several of their facility terminals.

DeCarlo oversaw TWC-Baker's ODFL projects and worked closely with ODFL management, including Jerry Canada (Manager – Construction and Maintenance) and Joshua Barwick (Director – Real Estate Construction and Maintenance).

45.     For instance, on August 2, 2022, DeCarlo signed a pavement replacement contract (the "Minnesota Contract") in his capacity as Vice President of Operations for a project for ODFL in Blaine, Minnesota (the "Minnesota Project").  And on August 30, 2022, DeCarlo signed a second contract (the "Des Plains Contract") on behalf of TWC-Baker as its Vice President of Operations for a pavement replacement job for ODFL at Des Plains, Illinois (the "Des Plains Project").  Together, the contracts would provide millions of dollars in revenues for TWC-Baker.

46.     In the latter half of 2022, DeCarlo became even more disengaged with TWC-Baker and was not assimilating into the company environment.  After more than three years of failed attempts to develop DeCarlo into a successful leader, Baker and TWC-Baker leadership took a new approach and decided to change DeCarlo's reporting duties.

47.     Accordingly, On January 9, 2023, TWC-Baker modified DeCarlo's reporting duties pursuant to § 1(a) of the Employment Agreement such that DeCarlo would broaden his responsibilities and work more directly with Baker and report directly to Brad Wucherpfennig, Baker's CEO.  It was the company's hope that broadening DeCarlo's responsibilities would enhance his leadership skills and better integrate him into the Baker enterprises.  With his expanded duties, DeCarlo was to bring leadership to Baker's concrete environmental agenda and work on other Baker assignments.  *See* Jan. 9, 2023 E-mail, **Exhibit B**.

48.     At Baker's direction, DeCarlo retained his duties associated with managing the TWC-Baker relationship with ODFL.  Accordingly, DeCarlo remained TWC-Baker's primary contact with ODFL.  DeCarlo continued overseeing ongoing ODFL projects.

49. DeCarlo assumed a larger role and remained an executive-level employee. He was not given a new title, and nothing officially changed about his employment.

50. DeCarlo retained his TWC-Baker laptop, phone, truck, gas card, and access to certain confidential, proprietary, and trade secret information. DeCarlo continued to use his TWC-Baker e-mail for TWC-Baker business purposes, as well as personal purposes. He still signed his e-mails with a TWC-Baker tag below his signature. His compensation and substantial salary remained the same, and DeCarlo continued to be paid in full until his recent termination based upon the revelations that have come to the company's attention.

51. While DeCarlo continued to oversee the ODFL relationship, he showed little interest in expanding his Baker responsibilities. Instead, DeCarlo began threatening the company regarding the earnout provision of the Asset Purchase Agreement between TWC-Baker and TWC Services, even though the earnout, if any, is not payable until 2024.

52. Then, without any forewarning or explanation, on April 27, 2023, TWC-Baker received two letters from ODFL terminating TWC-Baker's contract without cause for the current ODFL projects in Des Plaines, Illinois and Blaine, Minnesota. TWC-Baker had performed approximately 70% of the Minnesota Project and 45% of the Des Plains Project before winter shut both projects down for the season. TWC-Baker was preparing to resume operations and complete the projects starting in May.

53. On May 2, 2023, in response to his direct inquiry, ODFL informed Donald Wagner of TWC-Baker that ODFL "just decided to go a different route."

54. Because ODFL is a major customer of TWC-Baker, the termination of the contracts has caused and will continue to cause irreparable harm to ODFL.

55.     Because DeCarlo remained the primary contact person for TWC-Baker's projects with ODFL, Donald Wagner, TWC-Baker's President, reached out to DeCarlo on May 1, 2023, asking if he knew anything about the termination or received any prior communications about it. DeCarlo asserted the same day that ODFL had sent him no information or notices regarding the termination, and offered to call ODFL "to get their reasoning for the termination."  The next day, DeCarlo asserted that he had not "received a return call back from OD[FL] yet" and acted as if he had no knowledge of what had occurred.  He even pretended to assist TWC-Baker in wrapping up the Projects, including by forwarding to Shellie Litzinger, TWC-Baker's financial manager, executed subcontractor contracts for the two projects.

56.     Shortly thereafter, two TWC-Baker forepersons who worked closely with DeCarlo, Damon Harrison and Timothy Brock, resigned from TWC-Baker.  Harrison resigned on or about May 5, 2023; Brock resigned on or about May 8, 2023, and are now working with DeCarlo on ODFL's Des Plains and Minnesota projects.

57.     As it turns out, DeCarlo was behind both the contract terminations with ODFL and the resignation of Harrison and Brock.

**TWC-Baker's Investigation of DeCarlo's Disloyalty and Breaches**

58.     Upon termination of the ODFL projects and resignation of Harrison and Brock, Baker management became suspicious that DeCarlo was establishing a competing company to perform work for ODFL without TWC-Baker.  TWC-Baker launched its investigation in mid-May 2023 and it is ongoing.

59.     Accordingly, TWC-Baker accessed DeCarlo's company e-mail to gain insight into DeCarlo's activity.

60.     DeCarlo's e-mails revealed that DeCarlo has been planning to establish his own competing company, in blatant disregard of his employment obligations, for nearly a year.

61.     Specifically, on July 1, 2022, long before the change in his reporting responsibilities, DeCarlo filed Articles of Organization with the Ohio Secretary of State for "DeCarlo Concrete & Consulting, LLC."    *See* Ohio Secretary of State, Articles of Organization, **Exhibit C**.

62.     DeCarlo established this new concrete company with the intention of competing with TWC-Baker, and he started taking steps to do so, all while remaining a paid employee and officer of TWC-Baker.

63.     In January 2023, DeCarlo started frequently forwarding confidential and proprietary information from his TWC-Baker e-mail to his personal Gmail.

64.     For instance, on January 7, 2023, DeCarlo forwarded TWC-Baker's confidential subcontractor template to his personal Gmail that he had to request from Baker's general counsel. TWC-Baker derives economic value from this document not being generally known by the public, because competitors could use this form to take advantage of tested, favorable contract terms that TWC-Baker has developed over the years.  The document is subject to reasonable efforts to maintain its secrecy, including limiting its distribution within the company—hence, DeCarlo had to request the document—and by requiring certain employees to sign confidentiality agreements.

65.     On January 9, 2023, DeCarlo forwarded to his personal Gmail a quote prepared for TWC-Baker by a subcontractor for a fabric structure for the ODFL Minnesota Project.  TWC-Baker derives economic value from this document not being generally known by, or readily accessible to, the public, because it arises from TWC-Baker's relationship with its subcontractors that it has developed over the years.  A competitor with access to this information would allow it to unfairly take advantage of TWC-Baker's subcontractor relationships and strategy.  TWC-Baker

takes reasonable efforts to maintain the secrecy of this document, including by limiting its distribution within the company, and by requiring certain employees to sign confidentiality agreements.

66.     On January 18, 2023, DeCarlo forwarded to his personal Gmail TWC-Baker's confidential December 2022 Financials ("2022 Financial Statement"), which included confidential budget information, and a list of all TWC-Baker jobs from 2022, including customer name, contract value, estimated costs, and other proprietary information.  TWC-Baker derives economic value from this document not being generally known by, or readily accessible to, the public because it contains confidential budget information, a comprehensive list of TWC-Baker's customers, and information regarding project costs and expected profits.  A competitor with access to this information could target TWC-Baker's customers, undercut their costs, and obtain for themselves TWC-Baker projects.  TWC-Baker takes reasonable efforts to maintain the secrecy of this document, including by limiting its distribution to only thirteen people within TWC-Baker and Baker, and by requiring certain employees to sign confidentiality agreements.

67.     On February 10, 2023, DeCarlo forwarded to his personal Gmail a document prepared by TWC-Baker's Operations Manager, entitled "TWC Field Accomplishments."  This document set forth significant "changes, additions, and improvements" by TWC-Baker over the past two years.  TWC-Baker derives economic value from this document not being generally known by, or readily accessible to, the public because it contains confidential strategy information on TWC-Baker's operations, including notable improvements TWC-Baker developed over the past two years.  A competitor with access to this information could use this information to model its business off of TWC-Baker's strategy and take advantage of immediate access to strategy points that TWC-Baker spent two years developing.  TWC-Baker takes reasonable efforts to maintain the

secrecy of this document, including by limiting its distribution to only four people within TWC-Baker, and by requiring certain employees to sign confidentiality agreements.

68.     On May 4, 2023, DeCarlo forwarded to himself a photograph of a handwritten "Tool List" and a handwritten list of "Tools on my Truck."  DeCarlo seemingly compiled this list in anticipation of replicating TWC-Baker's strategic and confidential equipping and organizing of its company trucks.  TWC-Baker derives economic value from this information not being generally known by, or readily accessible to, the public because it contains confidential strategy information on TWC-Baker's operations, including the equipment TWC-Baker uses for its projects.  A competitor with access to this information could use this information to model its business off of TWC-Baker's strategy and equipping its trucks in the exact same manner.  TWC-Baker takes reasonable efforts to maintain the secrecy of this information, including by limiting the number of employees with TWC-Baker trucks, limiting public access to TWC-Baker trucks, and by requiring certain employees to sign confidentiality agreements.

69.     Additionally, from January to May 2023, DeCarlo forwarded to his personal Gmail numerous photographs of TWC-Baker job sites, and nearly fifty unknown files using "OneDrive," a Microsoft program that allows the sharing of files among accounts.  TWC-Baker uses OneDrive to store documents for all its programs, including Human Resources, IT, Accounting, Operations, and project information.  OneDrive is password protected and only limited employees can access documents in OneDrive.  Because of the nature of OneDrive, TWC-Baker is unable to determine at this time the contents of the shared OneDrive files.  TWC-Baker nonetheless believes, and is confident discovery will reveal, that these files contain TWC-Baker's trade secrets, confidential and/or proprietary information.

70.     Accordingly, to date, DeCarlo has improperly forwarded to his personal e-mail address confidential, proprietary, and trade secret information including, at least: TWC-Baker's subcontractor template; a subcontractor quote prepared for TWC-Baker; the 2022 Financial Statement setting forth budget, customer, and other proprietary information; an internal list of TWC-Baker's business strategy achievements; a compiled list of TWC-Baker's strategic equipment and tools; and nearly fifty other unknown files believed to contain confidential and proprietary information.

71.     While DeCarlo was misappropriating TWC-Baker's confidential and proprietary information, he was also conspiring with ODFL to misappropriate the Des Plains and Minnesota Projects for his own personal gain, all while pretending to remain a loyal TWC-Baker employee and while receiving a lucrative salary.

72.     On April 5, 2023, DeCarlo changed the name of "DeCarlo Concrete & Consulting LLC" to "Dominion Concrete Services, LLC," an apparent direct reference to the term "Dominion" in "Old Dominion Freight Line" that would allow him to conceal from TWC-Baker his activities. *See* State of Ohio Certificate, **Exhibit D**.

73.     On April 14, 2023, DeCarlo contacted ODFL seeking to purchase a retired ODFL freight truck for his new business.

74.     On May 1, 2023, DeCarlo contacted Key Bank asking for help "setting up some Key Bank business credit cards for my new business we just setup." On May 15, 2023, DeCarlo followed up with Key Bank, and informed the bank's representative of his "new email address": "adecarlo@dcs-concrete.com."

75.     On May 2, 2023, DeCarlo received an e-mail from Jerry Canada of ODFL, contradicting DeCarlo's prior statement to TWC Baker that he had no information regarding the

termination of the Des Plains and Minnesota Project.  Jerry Canada informed DeCarlo that "Josh just sent [a] response to Mr. Wagner that we have decided to move in a different direction.  I will let you know if we receive a response."  DeCarlo responded: "Okay, thank you for letting me know."  Later that same day, DeCarlo falsely told Don Wagner that he still had not heard anything from ODFL.  Jerry Canada and DeCarlo were colluding and communicating separately regarding ODFL's termination, because DeCarlo was in fact executing his own contract with ODFL.

76.     Months and months of collusion between DeCarlo, Dominion, and ODFL culminated on May 11, 2023, when ODFL and Dominion executed contracts for the Des Plains and Minnesota Projects previously belonging to TWC-Baker.  Dominion and ODFL executed nearly identical contracts to that which existed between ODFL and TWC-Baker, with the same price and scope remaining on the ODFL–TWC-Baker contracts.  DeCarlo signed the new contracts on behalf of Dominion, just as he had signed the original August 2022 contracts on behalf of TWC-Baker.  In other words, DeCarlo, without the consent or knowledge of TWC-Baker, colluded with ODFL to take for his own benefit work previously belonging to TWC-Baker, his employer.  The total revenue on the new contracts is several million dollars.  This all occurred while DeCarlo remained a TWC-Baker employee.

77.     It is highly likely that DeCarlo's responsibilities for Dominion are identical to those he had for TWC-Baker.  In that regard, he is overseeing the exact same projects he oversaw for TWC-Baker as the principal contractor and is necessarily performing the same tasks.

78.     Dominion is a "Conflicting Organization" under the Employment Agreement because it is an entity "engaged in, or planning or attempting to become engaged in, construction [and] concrete services."  Employment Agreement Exh. A(c).

79.     DeCarlo's employment by Dominion lies within the restricted "Territory" because it is located in Ohio.  Employment Agreement Exh. A(f).  Additionally, DeCarlo performed work for Dominion and ODFL within the restricted "Territory" because he performed work in the Minnesota and Des Plains Projects, each of which are located where TWC-Baker has direct operations and has engaged in substantial marketing of its services—indeed, TWC-Baker performed those very Projects until DeCarlo intervened.

80.     DeCarlo has also solicited, and continues to solicit, employees and former employees of TWC-Baker to work for him and his new company.

81.     On information and belief, DeCarlo and Dominion intend to continue competing with TWC-Baker in the concrete and construction industry, soliciting TWC-Baker customers, and using TWC-Baker trade secrets to do so.

82.     On May 5, 2023, Damon Harrison (a TWC-Baker foreman) resigned from TWC-Baker, claiming that he was going to work for Maxim Services, LLC, a company with close ties to ODFL.  On May 8, 2023, Timothy Brock (another TWC-Baker foreman) also resigned from TWC-Baker, making the same claim.

83.     The two men stated that they would initially be working on the Minnesota Project which, as it turns out, is being led by DeCarlo.

84.     E-mails between Damon and DeCarlo provide additional evidence that the two foremen are now working for DeCarlo and/or Dominion.

85.     Specifically, Damon forwarded several work-related e-mails to DeCarlo at his new Dominion e-mail address after Damon resigned from TWC Baker, including e-mails regarding transferring Damon's work cell phone number to his personal phone, receipts for a new cellphone case, and information regarding the rental of porta-potties in Minnesota.

86. DeCarlo intends to continue soliciting former employees of TWC-Baker. On May 16, 2023, DeCarlo stated that he plans to have a recently laid-off TWC-Baker employee come work for him and his new company.

87. All throughout this time, DeCarlo retained his position as an executive officer of Baker, accepting full salary and benefits, and never offering to resign. He also retained his TWC-Baker laptop with access to TWC-Baker programs, systems, and confidential information, his TWC-Baker cell phone, his TWC-Baker truck, and his TWC-Baker gas card.

88. Remarkably, DeCarlo continued to make charges for fuel on his TWC-Baker gas card, even after he signed the new Dominion contracts with ODFL on May 11, 2023. Specifically, DeCarlo charged his TWC-Baker gas card on May 14, 28, 25, and 29. Presumably, DeCarlo believed he could conceal his illegal scheme indefinitely.

89. Upon learning of DeCarlo's egregious disregard for his contractual and fiduciary duties to TWC Baker, DeCarlo was terminated for cause on June 6, 2023.

90. Because DeCarlo was terminated on June 6, 2023, the "Restricted Period" under the Employment Agreement continues until June 6, 2024.

91. TWC-Baker has suffered, and will continue to suffer, irreparable harm if DeCarlo and Dominion are not enjoined from further violating TWC-Baker's contractual, trade secret, and fiduciary rights.

92. Specifically, TWC-Baker has already lost significant profits from the misappropriation by DeCarlo through Dominion of TWC-Baker's business opportunities, including the Minnesota and Des Plains Projects.

93. TWC-Baker risks losing additional customers and business if DeCarlo continues to operate Dominion, a conflicting organization, in direct competition with TWC-Baker.

94.     Additionally, DeCarlo has misappropriated, and inevitably will disclose, TWC-Baker's trade secrets that it has committed substantial resources to developing and maintaining its secrecy.

### Count I: Breach of Employment Agreement (Injunctive Relief)
**(Asserted against DeCarlo)**

95.     Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

96.     DeCarlo's conduct constitutes a continuing breach of the Noncompetition, Nonsolicitation, and Confidentiality provisions of the Employment Agreement.

97.     The Employment Agreement is a valid and legally enforceable agreement that TWC-Baker and DeCarlo entered into freely and without duress.

98.     TWC-Baker fully performed its obligations under the Employment Agreement.

99.     The Noncompetition, Nonsolicitation, and Confidentiality provisions are reasonable in scope and reasonably tailored to protect TWC-Baker's legitimate interests.

100.     DeCarlo agreed that the "duration, geographic scope and activity restrictions" in the Noncompetition provision "are reasonable."  Employment Agreement § 6.

101.     By creating and working for Dominion, as set forth above, DeCarlo directly and indirectly performed and continues to perform services on behalf of a Conflicting Organization within the defined Territory that are substantially similar to those that DeCarlo performed for TWC-Baker and its affiliates.  Employment Agreement § 6(a).

102.     By performing work for ODFL in the Des Plains and Minnesota Projects, as set forth above, DeCarlo directly and indirectly undertook, on behalf of a Conflicting Organization within the defined Territory, action related to performance of services for the benefit of a TWC-

Baker customer (ODFL) as to whom DeCarlo made sales efforts, provided customer support, and had received confidential information about. Employment Agreement § 6(b).

103. DeCarlo also engaged in practices to evade his Noncompetition obligations, including by secretly creating his own company and changing its name to "Dominion Concrete Services" to prevent detection of his involvement in the company. Employment Agreement § 6(d).

104. DeCarlo also directly or indirectly, solicited, induced, or otherwise offered employment to, or engaged in discussions regarding employment or engagement as an independent contractor, with at least three TWC-Baker employees, including Timothy Brock and Damon Harrison, neither of whom have been separated from TWC-Baker for 12 months. Employment Agreement § 7.

105. DeCarlo used, disclosed, kept and made copies of, and assisted third parties in engaging in the foregoing, in violation of his Confidentiality, Nonuse, and Nondisclosure obligations. Employment Agreement § 5. DeCarlo possesses confidential and proprietary information obtained from TWC-Baker by virtue of his promise to abide by the terms of the Employment Agreement. His use of such confidential information against TWC-Baker amounts to unfair competition for which there is no adequate remedy at law.

106. DeCarlo performed each for the foregoing actions during his employment with TWC-Baker and well before his one-year restrictive covenants expired.

107. TWC-Baker is entitled to injunctive relief for any and all breaches or threatened breaches of the Noncompetition, Nonsolicitation, and Confidentiality provisions of the Employment Agreement.

108. Unless immediately restrained and enjoined, DeCarlo will continue to cause such irreparable harm, damage, and injury to TWC-Baker.

109.     TWC-Baker therefore requests that the Court issue a temporary restraining order, preliminary injunction, and permanent injunction against DeCarlo enjoining him, individually and/or through Dominion, from any further breach of the Employment Agreement, as well as additional injunctive relief as specified.

## Count II: Breach of Employment Agreement (Damages)
### (Asserted against DeCarlo)

110.     Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

111.     The conduct of DeCarlo in competing, soliciting employees, and using and/or disclosing TWC-Baker's proprietary and confidential information and trade secrets constitutes a breach of DeCarlo's Employment Agreement.

112.     TWC-Baker has been substantially damaged as a direct and proximate result of DeCarlo's willful and flagrant violation of his Employment Agreement.  TWC-Baker has suffered economic harm and other damages, the amount and extent of which have not yet been determined, and for which DeCarlo is liable.

## Count III: Misappropriation of Trade Secrets/Defend Trade Secrets Act (Injunctive Relief)
### (Asserted against DeCarlo and Dominion)

113.     Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

114.     Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., this Court may act in equity to enjoin threatened misappropriations of Trade Secrets.

115.     TWC-Baker entrusted the afore-described confidential and proprietary information and trade secret information to DeCarlo solely for his use in performing his employment duties for the benefit of plaintiff.

116. This includes, without limitation, approximately fifty OneDrive files containing some of the company's most sensitive information; TWC-Baker's subcontractor template; TWC-Baker's 2022 Financial Statement, which includes not only confidential budget information but also a comprehensive list of all outstanding TWC-Baker projects, customer names, costs and expected profits for each project; TWC-Baker's equipment information; TWC-Baker's strategic developments; and photographs of TWC-Baker job sites.

117. The afore-described confidential and proprietary information provided and entrusted to DeCarlo contained information which derived economic value from not being generally known by others who can obtain economic value from its disclosure or use—namely, TWC-Baker's competitors.

118. If disclosed to TWC-Baker competitors, the afore-described confidential and proprietary information will be used to gain a significant advantage over TWC-Baker. Competitors may access TWC-Baker's customer list, undercut TWC-Baker's prices, and utilize TWC-Baker's confidential strategies.

119. TWC-Baker has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain its confidential and proprietary information.

120. TWC-Baker has taken reasonable steps under the circumstances to maintain the secrecy of its confidential and proprietary information, including by requiring employees, such as DeCarlo, to sign Confidentiality, Nonuse and Nondisclosure Agreements, by setting forth confidentiality obligations in the TWC-Baker employee handbook, by limiting disclosure of sensitive documents, and by requiring employees to password-protect their computers and use dual authentication.

121.    The afore-described confidential and proprietary information was and is a trade secret under the Defend Trade Secrets Act of 2016.  18 U.S.C. § 1836, et seq.

122.    The afore-described confidential and proprietary information is related to TWC-Baker's service used in interstate commerce, because TWC-Baker operates nationwide, including by servicing the Des Plains and Minnesota Projects.

123.    DeCarlo's conduct constitutes misappropriation under the Defend Trade Secrets Act because DeCarlo solicited a TWC-Baker customer (ODFL), and has used, threatened to use, and inevitably will use TWC-Baker's trade secret information in his employment with Dominion and/or through his work for ODFL.

124.    At the time DeCarlo misappropriated TWC-Baker's trade secrets, he knew that he acquired those trade secrets by improper means and had clear knowledge that his access to the protected information gave rise to a duty to maintain the information's secrecy.

125.    DeCarlo's conduct was performed individually for his own benefit and as an agent of Dominion for Dominion's benefit.

126.    The actual and/or threatened misappropriation of trade secrets described above, including DeCarlo and Dominion's use of TWC-Baker customer, subcontractor, strategy, and financial information, is ongoing, continuing, and is causing or threatens to cause irreparable harm to TWC-Baker.

127.    Unless immediately restrained and enjoined, DeCarlo and Dominion will continue to cause damage, loss of competitive position, and irreparable harm and injury to TWC-Baker for which there is no adequate remedy at law.

128.    TWC-Baker therefore requests that the Court issue a temporary restraining order, preliminary injunction, and permanent injunction against DeCarlo and Dominion enjoining them

26

from any misappropriation of TWC-Baker's trade secrets, as well as additional injunctive relief as specified.

### **Count IV: Misappropriation of Trade Secrets/Defend Trade Secrets Act (Damages)**
**(Asserted against DeCarlo and Dominion)**

129.    Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

130.    TWC-Baker entrusted the afore-described confidential and proprietary information and trade secret information to DeCarlo solely for his use in performing his employment duties for the benefit of plaintiff.

131.    This includes, without limitation, approximately fifty OneDrive files containing some of the company's most sensitive information; TWC-Baker's subcontractor template; TWC-Baker's 2022 Financial Statement, which includes not only confidential budget information but also a comprehensive list of all outstanding TWC-Baker projects, customer names, costs and expected profits for each project; TWC-Baker's equipment information; TWC-Baker's strategic developments; and photographs of TWC-Baker job sites.

132.    The afore-described confidential and proprietary information provided and entrusted to DeCarlo contained information which derived economic value from not being generally known by others who can obtain economic value from its disclosure or use—namely, TWC-Baker's competitors.

133.    If disclosed to TWC-Baker competitors, the afore-described confidential and proprietary information will be used to gain a significant advantage over TWC-Baker. Competitors may access TWC-Baker's customer list, undercut TWC-Baker's prices, and utilize TWC-Baker's confidential strategies.

134.     TWC-Baker has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain its confidential and proprietary information.

135.     TWC-Baker has taken reasonable steps under the circumstances to maintain the secrecy of its confidential and proprietary information, including by requiring employees, such as DeCarlo, to sign Confidentiality, Nonuse and Nondisclosure Agreements, by setting forth confidentiality obligations in the TWC-Baker employee handbook, by limiting disclosure of sensitive documents, and by requiring employees to password-protect their computers and use dual authentication.

136.     The afore-described confidential and proprietary information was and is a trade secret under the Defend Trade Secrets Act of 2016.  18 U.S.C. § 1836, et seq.

137.     The afore-described confidential and proprietary information is related to TWC-Baker's service used in interstate commerce, because TWC-Baker operates nationwide, including by servicing the Des Plains and Minnesota Projects.

138.     DeCarlo's conduct constitutes misappropriation under the Defend Trade Secrets Act because DeCarlo solicited a TWC-Baker customer (ODFL), and has used, threatened to use, and inevitably will use TWC-Baker's trade secret information in his employment with Dominion and/or through his work for ODFL.

139.     At the time DeCarlo misappropriated TWC-Baker's trade secrets, he knew that he acquired those trade secrets by improper means and had clear knowledge that his access to the protected information gave rise to a duty to maintain the information's secrecy.

140.     DeCarlo's conduct was performed individually for his own benefit and as an agent of Dominion for Dominion's benefit.

141.    As a result of the actual and/or threatened misappropriation of trade secrets described above, TWC-Baker has suffered and will continue to suffer damages in an amount to be determined at trial.

142.    DeCarlo and Dominion misappropriated TWC-Baker's trade secrets knowingly, willfully, maliciously, intentionally, and in bad faith as to warrant the imposition of punitive damages and attorneys' fees in an amount to be determined at trial.

### **Count V: Misappropriation of Trade Secrets/Ohio Uniform Trade Secrets Act**
### **(Injunctive Relief)**
### **(Asserted against DeCarlo and Dominion)**

143.    Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

144.    Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

145.    Pursuant to the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61, et seq., this Court may act in equity to enjoin threatened misappropriations of Trade Secrets.

146.    TWC-Baker entrusted the afore-described confidential and proprietary information and trade secret information to DeCarlo solely for his use in performing his employment duties for the benefit of plaintiff.

147.    This includes, without limitation, approximately fifty OneDrive files containing some of the company's most sensitive information; TWC-Baker's subcontractor template; TWC-Baker's 2022 Financial Statement, which includes not only confidential budget information but also a comprehensive list of all outstanding TWC-Baker projects, customer names, costs and expected profits for each project; TWC-Baker's equipment information; TWC-Baker's strategic developments; and photographs of TWC-Baker job sites.

148.    The afore-described confidential and proprietary information provided and entrusted to DeCarlo contained information which derived economic value from not being generally known by others who can obtain economic value from its disclosure or use—namely, TWC-Baker's competitors.

149.    If disclosed to TWC-Baker competitors, the afore-described confidential and proprietary information will be used to gain a significant advantage over TWC-Baker. Competitors may access TWC-Baker's customer list, undercut TWC-Baker's prices, and utilize TWC-Baker's confidential strategies.

150.    TWC-Baker has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain its confidential and proprietary information.

151.    TWC-Baker has taken reasonable steps under the circumstances to maintain the secrecy of its confidential and proprietary information, including by requiring employees, such as DeCarlo, to sign Confidentiality, Nonuse and Nondisclosure Agreements, by setting forth confidentiality obligations in the TWC-Baker employee handbook, by limiting disclosure of sensitive documents, and by requiring employees to password-protect their computers and use dual authentication.

152.    The afore-described confidential and proprietary information was and is a trade secret under the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61, et seq.

153.    DeCarlo's conduct constitutes misappropriation under the Ohio Uniform Trade Secrets Act because DeCarlo solicited a TWC-Baker customer (ODFL), and has used, threatened to use, and inevitably will use TWC-Baker's trade secret information in his employment with Dominion and/or through his work for ODFL.

154.     At the time DeCarlo misappropriated TWC-Baker's trade secrets, he knew that he acquired those trade secrets by improper means and had clear knowledge that his access to the protected information gave rise to a duty to maintain the information's secrecy.

155.     DeCarlo's conduct was performed individually for his own benefit and as an agent of Dominion for Dominion's benefit.

156.     The actual and/or threatened misappropriation of trade secrets described above, including DeCarlo and Dominion's use of TWC-Baker customer, subcontractor, strategy, and financial information, is ongoing, continuing, and is causing or threatens to cause irreparable harm to TWC-Baker.

157.     Unless immediately restrained and enjoined, DeCarlo and Dominion will continue to cause damage, loss of competitive position, and irreparable harm and injury to TWC-Baker for which there is no adequate remedy at law.

158.     TWC-Baker therefore requests that the Court issue a temporary restraining order, preliminary injunction, and permanent injunction against DeCarlo and Dominion enjoining them from any misappropriation of TWC-Baker's trade secrets.

### Count VI: Misappropriation of Trade Secrets/Ohio Uniform Trade Secrets Act (Damages)
### (Asserted against DeCarlo and Dominion)

159.     Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

160.     Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

161.    TWC-Baker entrusted the afore-described confidential and proprietary information and trade secret information to DeCarlo solely for his use in performing his employment duties for the benefit of plaintiff.

162.    This includes, without limitation, approximately fifty OneDrive files containing some of the company's most sensitive information; TWC-Baker's subcontractor template; TWC-Baker's 2022 Financial Statement, which includes not only confidential budget information but also a comprehensive list of all outstanding TWC-Baker projects, customer names, costs and expected profits for each project; TWC-Baker's equipment information; TWC-Baker's strategic developments; and photographs of TWC-Baker job sites.

163.    The afore-described confidential and proprietary information provided and entrusted to DeCarlo contained information which derived economic value from not being generally known by others who can obtain economic value from its disclosure or use—namely, TWC-Baker's competitors.

164.    If disclosed to TWC-Baker competitors, the afore-described confidential and proprietary information will be used to gain a significant advantage over TWC-Baker. Competitors may access TWC-Baker's customer list, undercut TWC-Baker's prices, and utilize TWC-Baker's confidential strategies.

165.    TWC-Baker has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain this information.

166.    TWC-Baker has taken reasonable steps under the circumstances to maintain the secrecy of its confidential and proprietary information, including by requiring employees, such as DeCarlo, to sign Confidentiality, Nonuse and Nondisclosure Agreements, by setting forth confidentiality obligations in the TWC-Baker employee handbook, by limiting disclosure of

sensitive documents, and by requiring employees to password-protect their computers and use dual authentication.

167. The afore-described confidential and proprietary information was and is a trade secret under the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61, et seq.

168. DeCarlo's conduct constitutes misappropriation under the Ohio Uniform Trade Secrets Act because DeCarlo solicited a TWC-Baker customer (ODFL), and has used, threatened to use, and inevitably will use TWC-Baker's trade secret information in his employment with Dominion and/or through his work for ODFL.

169. At the time DeCarlo misappropriated TWC-Baker's trade secrets, he knew that he acquired those trade secrets by improper means and had clear knowledge that his access to the protected information gave rise to a duty to maintain the information's secrecy.

170. DeCarlo's conduct was performed individually for his own benefit and as an agent of Dominion for Dominion's benefit.

171. As a result of the actual and/or threatened misappropriation of trade secrets described above, TWC-Baker has suffered and will continue to suffer damages in an amount to be determined at trial.

172. DeCarlo and Dominion misappropriated TWC-Baker's trade secrets knowingly, willfully, maliciously, intentionally, and in bad faith as to warrant the imposition of punitive damages and attorneys' fees in an amount to be determined at trial.

### Count VII: Breach of Fiduciary Duty
**(Asserted against DeCarlo)**

173. Plaintiff incorporates by reference into this paragraph each of its allegations from the preceding paragraphs.

174.    DeCarlo, as an employee of TWC-Baker and as TWC-Baker's Vice President occupied a position of trust and confidence in the TWC-Baker organization.  His position imposed on him a fiduciary duty of loyalty to TWC-Baker and a duty not to misappropriate TWC-Baker's business opportunities for himself.

175.    DeCarlo breached that duty when he created DeCarlo Concrete & Consulting LLC, now known as Dominion, an entity intended to compete with TWC-Baker.

176.    DeCarlo also breached that duty when he, through Dominion, misappropriated for himself a business opportunity previously belonging to TWC-Baker.

177.    DeCarlo also breached that duty when he used and disclosed TWC-Baker's confidential and proprietary information and trade secrets to create and perform work for a competing entity.

178.    And, DeCarlo breached that duty when he concealed his scheme, failed to disclose his competing interests, and misrepresented his intentions with TWC-Baker, all while collecting an executive salary from TWC-Baker.

179.    As a direct and proximate result of DeCarlo's breaches, TWC-Baker has suffered and will continue to suffer damages in an amount to be determined at trial.

180.    TWC-Baker is entitled to recover its damages from DeCarlo, including a disgorgement of DeCarlo's compensation during his period of disloyalty.

181.    In addition, due to the outrageous and unjustified nature of DeCarlo's conduct, TWC-Baker is entitled to a judgment against DeCarlo for punitive damages.

### **Prayer for Relief**

**WHEREFORE**, Plaintiff TWC Concrete LLC demands judgment in its favor and against Defendants as follows:

a. on **Count I**, that the Court issue immediate, temporary, preliminary, and permanent injunctive relief prohibiting DeCarlo, directly or through Dominion, from breaching the Noncompetition, Nonsolicitation, and Confidentiality provisions of the Employment Agreement;

b. On **Count II**, that the Court award TWC-Baker compensatory damages, punitive damages, and reasonable attorney fees in an amount to be determined at trial;

c. On **Count III**, that the Court issue immediate, temporary, preliminary, and permanent injunctive relief prohibiting DeCarlo and Dominion from misappropriating or threatening to misappropriate TWC-Baker's trade secrets;

d. On **Count IV**, that the Court award TWC-Baker compensatory damages, punitive damages, and reasonable attorney fees in an amount to be determined at trial;

e. On **Count V**, that the Court issue immediate, temporary, preliminary, and permanent injunctive relief prohibiting DeCarlo and Dominion from misappropriating or threatening to misappropriate TWC-Baker's trade secrets;

f. On **Count VI**, that the Court award TWC-Baker compensatory damages, punitive damages, and reasonable attorney fees in an amount to be determined at trial;

g. On **Count VII**, that the Court award TWC-Baker compensatory damages, punitive damages, and reasonable attorney fees in an amount to be determined at trial;

h. That the Court issue an order awarding TWC-Baker all other relief the Court finds equitable and just, including additional injunctive relief, preservation of all evidence, reasonable attorneys' fees and costs, prejudgment interest, and post-judgment interest.

Dated: June 6, 2023

Respectfully submitted,

W. Breck Weigel (#0003160)
Ellen H. Phillips (#0097757)
Shams H. Hirji (#0099227)
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: +1 513 361 1200
Facsimile: +1 513 361 1201
E-mail: breck.weigel@squirepb.com
        ellen.phillips@squirepb.com
        shams.hirji@squirepb.com

*Attorneys for Plaintiff*

**VERIFICATION**

I have reviewed the Complaint. Regarding the allegations of which I have personal knowledge, I know or believe them to be true. Regarding the allegations of which I do not have personal knowledge, I believe them to be true based on company information, documents, or both. Under the penalty of perjury, I declare that the foregoing is true and correct. Executed on this 6th day of June, 2023.

Donald J. Wagner

PRESIDENT TWC CONCRETE LLC